UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

SHAWANDA MURRY,

                    Plaintiff,

-vs-                                          Case No.  5:04-cv-498-Oc-10GRJ

ALBERTO R. GONZALES,
United States Attorney General,

                    Defendant.
_____

## **O R D E R**

This Title VII retaliation case is before the Court for consideration of the Defendant,

Alberto R. Gonzales, United States Attorney General's Motion for Summary Judgment

(Doc.  30).  The Plaintiff, who is proceeding *pro se*, has filed a response in opposition,

(Doc.  35), and the motion is ripe for review.  Having considered the arguments of both

parties, the motion is due to be granted.

## **Background**

The following is a recitation of the material facts viewed in the light most favorable

to the Plaintiff.  United States v.  Diebold, Inc., 369 U.S. 654, 655 (1962).

A.    The Parties

The Plaintiff, Shawanda Murry, is an African American female residing in Marion

County, Florida.   Murry served in the United States Navy for seven years, and was

honorably discharged in 1995.  At that time, she began working at the Federal Correctional

Center in Coleman, Florida ("Coleman") as a Cook Supervisor in the low security facility at Coleman, where she remained until her employment terminated in 2004.  As a Cook Supervisor, Murry's duties included preparing and serving meals to the inmates, as well as supervising 25-30 inmates and other employees who worked in the food services area. Murry was also responsible for overseeing the receipt and storage of food and non-food items, and ensuring that all kitchen equipment was secure and accounted for at all times.

From 1997 to June 2002, Murry's immediate supervisor was Anthony  Dickerson, Food Service Adminstrator.   In early July 2002, Dickerson transferred to Coleman's medium security facility.[1]   At that time, Sharryl Turner became Murry's immediate supervisor.  Murry's next level supervisor was Associate Warden ("AW") Anthony Wayne Phillips until his departure from Coleman in November 2003.  AW Phillips' immediate supervisor - and Murry's ultimate supervisor - was Warden Paul Laird, who was the warden at Coleman from February 2002 to January 2004.

Murry was generally a good employee, receiving good performance evaluations and several merit awards.  However, she occasionally had problems working with other staff and communicating with inmates.  While at Coleman, she filed numerous written and oral complaints concerning perceived inappropriate treatment by other staff members and correctional officers.

---

[1]Dickerson requested the transfer, as he admittedly was having difficulty successfully completing his job duties.  Prior to his transfer, an Operational Review was conducted of the Food Service Department, which found numerous deficiencies in Dickerson's supervision of employees, and maintenance of administrative paperwork.

B.   Ms.  Murry's 2001 EEO Complaint.

On or about June 12, 2001, Murry filed an EEO complaint with the United States Department of Justice, alleging that she had been subjected to both race and sex harassment between March and May of 2001 (the "2001 EEO complaint").  In particular, Murry claimed to have been disrespected by various white male lieutenants and corrections officers, and that she had complained to her superiors - including AW Phillips - without any resolution.  In the 2001 EEO complaint, Murry points to one incident where Officer Robles in the special housing segregation unit allegedly swore at Murry, made her wait to enter the unit, and belittled her.  There are no allegations that Robles' language contained any racial or gender epithets.  Murry also alleged that corrections officers used the phrase "unleash them" rather than "let them out" when referring to inmates being released for meals, and that she was yelled at by supervisory corrections officers when she complained about these comments.

During the internal investigation of this complaint, Murry's immediate supervisor, Dickerson, and AW Phillips were interviewed.  Both provided testimony that was favorable to Murry's claims.  Warden Laird did not learn of Murry's 2001 EEO complaint until April 2002, when Murry mentioned it to him during a conversation.  It is not entirely clear when Turner learned of the EEO complaint, as she was not  involved in the investigation, and did not supervise Murry during the time period in question.  However, on at least one occasion

in March or April of 2002, Turner mentioned the 2001 EEO complaint to Murry, stating that Murry should expect a response soon.[2]

The 2001 EEO complaint was eventually resolved, with a finding that Murry did not suffer any racial or gender discrimination.

C.    Ms. Murry's 2001-2002 Annual Evaluation

Employees at Coleman, including Murry, are evaluated by their immediate supervisors on both a quarterly and annual basis.  Every three months, the appropriate immediate supervisor must fill out a "Quarterly Performance Log," which records the employee's performance in seven main areas.  These quarterly logs are used in part by the immediate supervisor to prepare the employee's annual evaluation, and are not reviewed by any other supervisor.  Other than the employee being reviewed and his or her immediate supervisor, no other employee sees the quarterly logs, and they are not used for any other employment purpose (such as determining promotions or raises).  Both the quarterly logs and the annual evaluations rate employees in one of five categories: unsatisfactory, marginally successful, fully successful, exceeds, and outstanding.

Annual evaluations cover the time period from April of the preceding year to March of the current year, and are prepared by the employee's immediate supervisor.  They are also reviewed and signed by the employee's next level supervisor, in Murry's case, AW

---

[2]The Attorney General contends that Turner had no knowledge of Murry's 2001 EEO complaint at all, however for purposes of this motion, the Court will interpret all factual disputes in the light most favorable to Murry.

Philllips.  The warden does not become involved in the evaluation process unless both supervisors determine that the employee should receive an overall annual rating of "outstanding" - the highest rating available.

In 2001, Murry became pregnant with twins.  She returned from her three-month maternity leave in April 2002, thereby missing the last quarter of work for the April 2001- March 2002 annual evaluation period.  During that evaluation period, Dickerson did not maintain complete quarterly logs for Murry.  In addition to the absence of a quarterly log for the period Murry was on maternity leave, he did not complete one other quarterly log. For the two quarterly logs he did complete, Dickerson rated Murry as "outstanding" in all areas.

Murry received her annual evaluation for April 2001 to March 2002 from Dickerson on or about June 24, 2002.  Dickerson prepared the evaluation and rated Murry's overall performance as "exceeds" - the second highest evaluation level.  Although she has on occasion received ratings of "exceeds" in the past, her four prior evaluations, all prepared by Dickerson, had been rated at the highest level of  "outstanding."   Murry attempted to have her overall rating increased, but was not successful.

Dickerson testified at deposition that he wanted to award Murry an overall rating of "outstanding," but was not sure if he could do so given her absence for part of the year while on maternity leave.  He consulted AW Phillips, who informed Dickerson that an outstanding evaluation would not be appropriate, both because Dickerson had failed to maintain complete quarterly performance logs for the relevant time period to support the

higher rating, and because AW Phillips had personally observed Murry's job performance and did not believe it merited the highest evaluation rating.

Dickerson followed AW Phillip's directions and rated Murry as "exceeds." However, and unbeknownst to AW Phillips, Dickerson included a comment on the evaluation stating "Ms. Murry is an outstanding employee. Ms. Murry received an exceeds only because she was out for 3 months during her pregnancy."[3] AW Phillips did not become aware of Dickerson's comment until after Murry filed her complaint of retaliation in November 2002. In January 2003, AW Phillips brought Murry's annual evaluation to Warden Laird, who, after consulting with the human resources department, changed the evaluation to the highest "outstanding" level.[4] Warden Laird also provided Murry with a 40-hour time off award, which was given to all employees who received an "outstanding" rating. Although Warden Laird agreed with AW Phillips that Murry's job performance for 2001-2002 and her incomplete quarterly performance logs did not merit an "outstanding" rating, he changed her rating in response to Dickerson's inappropriate comment concerning Murry's maternity leave.[5]

---

[3]See Shawanda Murry's Employee Performance Appraisal, undated, attached as Exhibit 3 to Deposition of Anthony Dickerson (Exhibit 7 to Defendant's Motion for Summary Judgment).

[4]See January 7, 2003 Memorandum to Robin Pitcairn, Human Resources Manager, from Warden Laird, attached as Exhibit 32 to Deposition of Paul Laird (Exhibit 9 to Defendant's Motion for Summary Judgment).

[5]Id. Murry contends that Warden Laird changed her evaluation only in response to a notice from an EEO investigator that he wanted to interview Warden Laird in January 2003. Not only is this fact irrelevant, but Murry has produced no evidence to support this assumption. In addition,
(continued...)

Throughout her employment at Coleman, and in particular from 2002 through her termination, Murry never sought any promotions, was never denied any promotions, and was never denied any raises.  Other than a delay in receiving her 40-hour time off award, she suffered no adverse effects of the temporarily lowered evaluation.  Murry also testified during her deposition that the slightly lower evaluation did not prevent her from applying for any promotions.[6]

D.     2002-2003 Quarterly Performance Log Entries

Following Dickerson's transfer, Murry's immediate supervisor became Sherryl Turner.  Turner and Murry did not work well together and they often engaged in verbal confrontations.  According to Murry, Turner was rude and disrespectful to her on a regular basis, and held her to a higher performance standard.  According to Turner, Murry was the problem; refusing to take direction and yelling at Turner and other inmates.  Regardless of which opinion is correct, it is clear that Turner and Murry did not get along and frequently argued in front of inmates and staff.[7]

---

[5](...continued)
Murry contends that she did not receive the 40 hour time off award because she was "forced" to use this time off when she suffered a shoulder injury.  Again, there is no evidence to support this contention, and in any event, how she used this time off award is irrelevant, the undisputed fact is that she did receive it.

[6]See Deposition of Shawanda Murry, dated February 24, 2006, pp. 209-10 (attached as Exhibit 5 to Defendant's Motion for Summary Judgment).

[7]In fact, Turner had a very strict, at times negative management style, and was confrontational with many of her employees.

7

Turner prepared the quarterly performance logs for Murry from April 2002 until Murry's transfer to the institutional warehouse.  Turner rated Murry on the April-June 2002 quarterly log as "fully successful," the middle rating level.  Her prior quarterly logs, which were prepared by Dickerson, were all rated at the highest level - "outstanding."  Turner based these ratings on her observation of Murry's job performance.  Turner observed that Murry would start meals late, did not insure that inmates Murry supervised followed recipe cards, did not insure that cleaning and sanitation of the kitchen area was performed in a timely manner, did not turn in inmate pay sheets or other documentation, and was confrontational with inmates and staff.  Murry admits to these events, but argues Turner overreacted and was too strict in her supervision of Murry.

E.    Murry's Behavioral Problems

Commensurate with her problems working with Turner, Murry also had several behavioral issues, resulting in various complaints against her.   In May 2002, Dickerson spoke with Murry about various inmate complaints that Murry was disrespectful to inmates, snatched their food trays, and kicked them out of the Food Service Department.  Murry immediately went to Warden Laird, where she complained about these "unfounded allegations," as well as a number of personal issues, including the fact that she was tired from caring for her twin babies and that she felt she was held to a higher standard than other employees.

On June 17, 2002, Dickerson sent a letter to Murry documenting her problems "on the job due to concerns you have regarding inmates and your supervisors."[8]  Dickerson referred Murry to the Employee Assistance Program as a disciplinary measure.  On July 29, 2002, (after Turner became Murry's immediate supervisor), Murry refused to accept a food service delivery, and slammed the phone down while talking to the employee attempting to deliver the food.  On two other occasions, Murry refused to comply with Turner's direct orders.  The first occasion concerned the method by which an inmate was instructed to cook meat; and the second involved transferring one of the inmates from a cook position to line server position.

Murry's behavioral issues culminated with two incidents in August 2002.  On August 15, 2002, several staff members and inmates reported to Turner and the food service department head that Murry was telling inmates and staff that the meat used in a spaghetti lunch was bad, and that the inmates should not eat it.  Turner and AW Phillips viewed Murry's comments as extremely serious, as they could have incited the inmates to riot.[9]  Murry contends that she did not make any such comments, but rather they were made by an unidentified employee.

---

[8]See June 17, 2002 letter to Shawanda Murry, attached as Exhibit 26 to Deposition of Anthony Dickerson ( Exhibit 7 to Defendant's Motion for Summary Judgment).

[9]Turner and AW Phillips were particularly concerned given that Coleman had recently experienced a bout of food poisoning with the inmates food.  The meat used in the spaghetti lunch, however, was not bad.

9

On August 21, 2002, Murry had a confrontation with Turner, during which Turner accused Murry of not cleaning the kitchen properly, not insuring that certain doors were locked, and that Murry was not presenting food to the inmates properly.  During this confrontation, Murry stated that she had a migraine and asked to leave work early.  Turner told Murry to wait until a relief employee arrived.  However, Murry left immediately and walked over to Associate Warden Bauknecht's office.[10]  Murry, who was very upset, told AW Bauknecht that she was sick and needed to leave work early.  She also told AW Bauknecht that she had a brain tumor and had stopped taking her medication.  Catherine Wiggs, Case Management Coordinator, witnessed this conversation between Murry and AW Bauknecht and confirmed that Murry made the statements concerning a brain tumor and medication.  AW Bauknecht allowed Murry to leave work immediately.

Murry strongly disputes ever making the above statements to AW Bauknecht. However, she admits she has a pituitary tumor and that she had previously told both Dickerson and Warden Laird about her condition.  Until these events in 2002 there is no evidence that this tumor ever affected Murry's ability to perform her job duties.

Murry sought to have her 2001 EEO complaint amended to include each of these incidents, claiming that her supervisors' reactions to her behavior constituted harassment. Between April 30, 2002 and September 11, 2002 alone, Murry sought to amend her complaint ten times.

---

[10]Murry first attempted to speak with AW Phillips, but he was not available.

F.    Murry's Transfer to the Institutional Warehouse and Examination

Throughout 2002, Warden Laird received several complaints from inmates and staff concerning Murry's behavior.  He was also informed about the two incidents in August. Based on these episodes, which were occurring with more frequency and severity, coupled with the knowledge of Murry's tumor, Warden Laird decided that Murry should receive both a physical and psychological fitness for duty examination, to ensure that there were no physical or psychological causes for her inappropriate behavior.  Although Warden Laird made the ultimate decision on this issue, Turner prepared, signed, and delivered the letter to Murry on September 10, 2002, which informed Murry that she had to submit to the physical examination.  Turner also provided Murry with a letter on November 25, 2002 ordering her to report for a psychological examination.[11]

While Murry underwent these examinations, Warden Laird temporarily reassigned Murry from the dining hall to the institutional warehouse, which is located outside the secure perimeter of the low facility.  According to Warden Laird,  Murry's alleged inability to communicate with staff and inmates and frequent emotional outbursts led him to believe that she may be emotionally unsuitable for work within the correctional institution.  Warden Laird determined that for her own safety, Murry should be transferred to the institutional warehouse, where she would not supervise male inmates or have much interaction with

---

[11]Under the applicable guidelines, an employee must first undergo a physical fitness for duty examination before the employee can undergo a psychological fitness for duty examination. Warden Laird wanted Murry to have both exams, particularly in light of her statements to others concerning her brain tumor.  See 5 C.F.R. § 339.301(e)(1).

them.  To the extent Murry did interact with inmates, they were minimum security female inmates with the lowest propensity for violence.  Thus, if Murry had an outburst, or made an inappropriate comment, there was less risk an inmate would harm her.

Warden Laird transferred Murry to the institutional warehouse on August 26, 2002. Her duties at the warehouse included supporting other employees, and monitoring the inventory, as well as loading and unloading of food supplies.  Murry did not supervise any inmates while at the warehouse.  Her work schedule, job title, and compensation did not change, although Murry contends that she was not able to accrue overtime.

Murry performed her duties at the institutional warehouse generally without incident. However, she claims that on one occasion, while she was sitting in an office at the warehouse, the Material Handler Supervisor, Ms.  Ramos, opened the office door and sprayed an aerosol deodorizer into the office.  Murry suffered an allergic reaction to the deodorizer and went to the hospital for treatment.  While acknowledging that she had never interacted or worked with Ms.  Ramos before, Murry contends that this incident was in further retaliation for her 2001 EEO complaint.

Murry completed both fitness for duty examinations while working at the warehouse. She had her physical exam on September 16, 2002, and her psychological exam on December 4, 2002.  The examining physicians determined that Murry was both physically and psychologically fit for duty.  Warden Laird received the results of the physical examination in November, 2002 and the results of the psychological examination in early

January, 2003.[12]  As soon as he received the results, he directed that Murry be returned to her prior position in food services at the low security facility.  Murry returned to that position on January 8, 2003.

On January 14, 2003, Murry suffered a shoulder injury while lifting a box of plates, bowels and trays, and took disability leave for several weeks.  She returned to work on April 1, 2003, after being diagnosed with a torn rotator cuff.  On April 14, 2003, Murry filed a worker's compensation claim that she was suffering from an "occupational health disease."  Her claim was approved and she attended sessions with a clinical psychologist for the next two and one-half years.  At that point in time, her workers' compensation benefits terminated and Murry stopped seeing the clinical psychologist and began seeing a psychiatrist.

Murry had surgery on her shoulder on June 26, 2003, while she was still working at Coleman in the low facility.  On October 28, 2003, her supervisor[13] requested that Murry undergo a physical fitness assessment to determine her work restrictions.  Murry claims that she re-injured her shoulder during this assessment.  On August 21, 2004, Murry's employment with Coleman was terminated due to her inability to perform her essential job functions.  Murry stated at the pretrial conference held on August 23, 2006, that at the time

---

[12]Murry contends that Warden Laird waited several weeks before returning her to the Food Services Department.  However, there is no evidence supporting this allegation.  To the contrary, it appears that any delay was simply caused by the time it took to deliver the results of the examinations to Warden Laird.

[13]It is unclear who Murry's supervisor was at this time.

of her termination, she was physically unable to perform any job at Coleman, and that she remains unable to do so today. [14] Murry's termination occurred approximately seven (7) months after Warden Laird had left Coleman, and twenty-one (21) months after AW Phillips left.  It also does not appear that Turner had any knowledge of, or was involved in any decisions concerning Murry's shoulder injury or termination.

G.    Murry's 2002 EEO Retaliation Complaint

On June 27, 2002, Murry sought EEO counseling through Coleman, alleging that her lowered annual evaluation, lowered quarterly performance log ratings, and her transfer to the warehouse and fitness for duty exams were in retaliation for her 2001 EEO complaint. Murry completed her EEO counseling and filed a formal complaint of retaliation with the Department of Justice on or about November 4, 2002.  The retaliation complaint alleged that her supervisor, Turner, was harassing her and that AW Phillips and Warden Laird would not stop Turner's harassment.  In particular, Murry alleged that Turner lowered Murry's evaluation, banned her from the low facility, and ordered her to undergo the two fitness for duty examinations.

Murry later sought to amend her EEO complaint to include the allegations surrounding her shoulder injuries and the eventual termination of her employment. However, these allegations were not considered by the EEO Administrative Judge assigned to her claim.  Although the record in this case is largely devoid of any evidence

---

[14]Murry had a second shoulder surgery on October 26, 2004.

concerning these allegations, Murry stated at the August 23, 2006 pretrial conference that she voluntarily dismissed her claims concerning her shoulder injuries and termination in order to pursue relief with the Merit Systems Protection Board.  Those administrative proceedings were not resolved until May 16, 2006.  As of the date of this Order, the Court is unaware of any further amendments to Murry's EEO complaint, and does not believe that Murry has filed a new EEO complaint incorporating these events.

The United States Department of Justice investigated her complaint and found it to have no merit.  Dissatisfied with this result, Murry requested a hearing with an Administrative Judge appointed by the Equal Employment Opportunity Commission.  On July 16, 2004, following the conclusion of her own independent investigation, the Administrative Judge issued an 18-page findings of fact and conclusions of law, determining that Murry did not suffer any discrimination in retaliation for her 2001 EEO complaint.

H.   Procedural History

Murry received her notice of right to sue letter from the United States Department of Justice, Complaint Adjudication Office on September 23, 2004, and she filed her timely Complaint in this Court on November 8, 2004 (Doc.  1).[15]  Her Complaint is against the Attorney General of the United States, in his role as the head of the Department of Justice

_____

[15]At the time she filed her Complaint, Ms.  Murry was represented by counsel.  On June 27, 2005, the Court granted her counsel's motion to withdraw, (Doc. 13), and Ms.  Murry has proceeded with this case *pro se.*

and the Bureau of Prisons, the agencies that employed Murry.  Her Complaint alleges one count of retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*, and centers around five main events: (1) the lowering of her 2001-02 annual evaluation; (2) the lowering of her 2002 and 2003 quarterly performance logs; (3) the mandatory physical fitness for duty examination; (4) the mandatory psychological fitness for duty examination; and (5) her transfer to the institutional warehouse.  The Complaint also contains a litany of other perceived retaliatory actions, such as hearsay comments about Murry, the deodorizer incident, and the events surrounding her shoulder injuries and termination.  Murry demands relief in the form of back pay, lost benefits, pre and post-judgment interest, compensatory damages for emotional distress, punitive damages, front pay and/or reinstatement, and attorneys' fees and costs.

Following the conclusion of discovery, the Attorney General filed his motion for summary judgment on April 5, 2006 (Doc.  30).  Murry filed her response in opposition on April 21, 2006 (Doc.  35).

## <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in

16

the record "in the light most favorable to the nonmoving party."  <u>Samples on Behalf of</u>

<u>Samples v. Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988).  As the Supreme Court held in

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), the moving party bears the initial burden of

establishing the nonexistence of a triable issue of fact.  If the movant is successful on this

score, the burden of production shifts to the non-moving party who must then come forward

with "sufficient evidence of every element that he or she must prove."  <u>Rollins v.</u>

<u>Techsouth</u>, 833 F.2d 1525, 1528 (11th Cir.  1987).  The non-moving party may not simply

rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or

other admissible evidence to demonstrate that a material fact issue remains to be tried.

### Discussion

In order to establish a *prima facie* claim of retaliation under Title VII, a plaintiff must

prove that: (1) she participated in protected activity; (2) she suffered an adverse

employment action; and (3) there is a causal connection between the participation in the

protected activity and the adverse employment action.  <u>Brown v. Snow</u>, 440 F.3d 1259,

1266 (11th Cir. 2006); <u>Wideman v. Wal-Mart Stores, Inc.</u>, 141 F.3d 1453, 1454 (11th Cir.

1998); <u>Reis v. Universal City Development Partners, Ltd.</u>, ___ F. Supp.2d ___, 2006 WL

2054178, * 12 (M.D. Fla. July 21, 2006).  If the plaintiff succeeds in establishing her *prima*

*facie* case, the defendant must come forward with a legitimate, non-retaliatory reason for

the adverse employment action.  <u>Pennington v. City of Huntsville</u>, 261 F.3d 1262, 1266

(11th Cir. 2001); <u>Olmsted v. Taco Bell Corp.</u>, 141 F.3d 1457, 1460 (11th Cir. 1998).

However, the "plaintiff bears the ultimate burden of proving by a preponderance of the

evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct." Olmsted, 141 F.3d at 1460.

There is no dispute that when Murry filed her 2001 EEO complaint, she engaged in protected activity as defined by Title VII.  See 42 U.S.C. § 2000e-3.  The parties disagree, however, on the other two elements of her *prima facie* case, as well as whether Warden Laird and Murry's other supervisors acted with a legitimate, non-retaliatory purpose.  The Court will address each issue separately.

I.      Adverse Employment Actions

The United States Supreme Court recently clarified the definition of an "adverse employment action" to provide that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." Burlington N. & Santa Fe Ry. Co. v. White, ___ U.S. ___, 126 S.Ct. 2405, 2415 (2006).  The Court emphasized that such adversity must be material as Title VII does not protect employees from "those petty slights or minor annoyances that often take place at work," and that whether an action is retaliatory in nature will be determined on a case by case basis. Id.  The Eleventh Circuit has applied a similar standard for quite some time. See Doe v. Dekalb County Sch. Dist., 145 F.3d 1441, 1447, 1453 (11th Cir. 1998) (a plaintiff "must demonstrate that a reasonable person in his position would view the employment action in question as adverse" and "[a]ny adversity must be material"); Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001) ("It is clear, however, that not all conduct by an employer negatively affecting an employee constitutes adverse employment action."); Gupta v.

18

Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000) ("Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim must be determined on a case-by-case basis, using both a subjective and an objective standard.") (internal citations omitted).

Of the five events Murry primarily focuses on:  (1) the lowering of her 2002 annual evaluation from outstanding to exceeds; (2) the lowering of her 2002 quarterly progress reports from outstanding to fully successful; (3) the forced physical fitness exam; (4) the forced psychological fitness exam; and (5) her transfer to the institutional warehouse; the Court finds that only Murry's transfer and fitness for duty examinations arguably constitute adverse employment actions.

> A.     The 2001-2002 Annual Evaluation

The Court concludes that Murry has not produced evidence to establish that a "reasonable employee" would have found the temporary change to her 2001-2002 evaluation "materially adverse."  The undisputed facts evidence that Murry did not suffer any adverse impact from the temporarily lowered annual evaluation.  Not only was the evaluation raised to "outstanding," but Murry was not denied any promotions or raises as a result of the temporarily lowered evaluation.  Murry also testified at her deposition that she had no intention of applying for any promotions until sometime in the undetermined future,[16] therefore any argument by Murry that this slightly lower evaluation had a chilling

---

[16]See Deposition of Shawanda Murry, pp. 209-10.

effect on her desire to seek promotion, or that she could have been impaired from receiving a promotion is purely speculative and without merit.   In addition, every supervisory employee who was deposed in this case testified that the difference between an "exceeds" and an "outstanding" overall evaluation is minimal, at best, and would not have harmed Murry's promotional chances.[17]   See Brown, 440 F.3d 1259 (a lower score on employee's performance evaluation, without more, is not actionable under Title VII anti-retaliation provisions where employee failed to establish that the lower score led to a more tangible form of adverse action, such as ineligibility for promotional opportunities); Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1261 (11th Cir. 2001) ("Negative performance evaluations, standing alone, do not constitute adverse employment action sufficient to satisfy the second element of a prima facie case of retaliation under the ADA."); Davis, 245 F.3d at 1241 (criticisms of an employee's job performance that do not lead to tangible job consequences "will rarely form a permissible predicate for a Title VII suit").

The only potentially adverse impact Murry could have suffered from receiving an "exceeds" rating is the loss of the 40 hour time off award, which is only provided to employees who receive an outstanding rating.   However, Murry received this award in January 2003, when Warden Laird increased her rating to "outstanding."   Therefore, Murry

---

[17]See e.g., Deposition of Anthony Dickerson, pp. 32-37; Deposition of Paul Laird, pp. 44-47; Deposition of Wayne A. Phillips, pp. 33-39 (Exhibit 8 to Defendant's Motion for Summary Judgment); Deposition of Sharryl Turner, pp. 18-22 (Exhibit 10 to Defendant's Motion for Summary Judgment).

has suffered no adverse employment action and the Attorney General is entitled to summary judgment on this portion of her claim.

B.      *Lowered Quarterly Progress Report*

Murry's allegation that her lowered quarterly progress report constitutes an adverse employment action fails for the same reason.  She has produced no evidence that she suffered any harm from this progress report.  By her own admission such reports do not impact any aspect of her employment,[18] and are merely one tool the immediate supervisor uses to prepare the annual evaluation.  And, as with her annual evaluation, Murry has submitted no evidence that she refrained from applying for a promotion as a result of these quarterly logs, was denied a promotion, or denied a raise or any other award or bonus.  As such, no reasonable employee would find that this lower quarterly performance log was "materially adverse."  See Lucas, 257 F.3d at 1261 (finding that negative performance evaluation was not adverse employment action where employer did not rely on the evaluation to make any employment decisions).

C.      *Fitness for Duty Examinations and Transfer to Warehouse*

The last three incidents of allegedly adverse employment action can be addressed together.  Murry contends that she was transferred from the Food Services Department to the institutional warehouse and forced to undergo physical and psychological fitness exams in retaliation for the filing of her 2001 EEOC complaint.  Although her job title, work hours

---

[18]See Deposition of Shawanda Murry, pp. 293-94.

and compensation did not change, Murry did not supervise employees at the warehouse and did not have the same job duties or level of responsibilities.   In addition, Murry presented some evidence that transfer to the institutional warehouse had a stigma associated with it - only "problem employees" were transferred there, and that she no longer had the ability to work overtime.   Given the change in job duties, the stigma of transferring to the warehouse, and the loss of overtime, the Court believes that a genuine issue of material fact exists with respect to whether a "reasonable employee" would consider a transfer to the warehouse to be "materially adverse."   See Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1283 (11th Cir. 1999) ("disadvantageous transfers" are actionable under Title VII's retaliation clause); Collins v. Miami-Dade County, 361 F. Supp.2d 1362 (S.D. Fla. 2005) (denial of a right to overtime may constitute an adverse employment action); Gaddis v. Russell Corp., 242 F. Supp. 2d 1123, 1145 (M.D. Ala. 2003) (a transfer to a different position can be adverse if it involves reduction in pay, prestige, or responsibility) (internal citations omitted).

Similarly, the Court finds that there are genuine issues of material fact concerning whether the two fitness for duty examinations constitute adverse employment actions. First, the two fitness for duty exams are inextricably intertwined with Murry's transfer to the institutional warehouse and her commensurate reduction in job duties and overtime - Warden Laird admitted that he transferred her to the warehouse while the exams were pending, and would not transfer her back until she successfully passed both exams. Second, there is a clear stigma associated with having to undergo these examinations,

particularly in Murry's case, where she had never demonstrated any physical inability to perform her job duties in the past, and there is no doubt that it was only her emotional and mental state that was in question.  Accordingly, the Court believes that genuine issues of material fact exist as to whether a reasonable employee would find that being forced to undergo a physical and psychological fitness for duty examination constitutes a "materially adverse" action, such that it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington Northern, 126 S.Ct. at 2415.  Cf. Giang v. Potter, 369 F.Supp.2d 763 (E.D. Va. 2005) (where employee remains in same position, at same grade and same salary while submitting for fitness for duty examination, there is no adverse employment action).

II.   Causal Connection

Having determined that Murry's transfer to the institutional warehouse and the two fitness for duty examinations constitute adverse employment actions, the next step is determining whether a causal connection exists between these actions and Murry's 2001 EEO complaint.  To establish such a causal connection, Murry must provide evidence that: (1) the decision-makers responsible for the adverse actions were aware of the protected activity; and (2) the adverse acts were at least somewhat related and in close temporal proximity to the protected activity.  Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004); Gupta v. Fl. Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000).

Murry contends that the two decision-makers were Warden Laird and Turner.[19] Murry filed her 2001 EEO complaint on June 12, 2001, fourteen (14) months before Warden Laird decided to transfer her to the institutional warehouse.  Similarly, Turner did not become Murry's immediate supervisor until approximately twelve (12) months after she filed her 2001 EEO complaint, was not involved in the allegations that form that complaint or its subsequent investigation, and did not sign and deliver the letters directing Murry to undergo the two examinations until fourteen (14) months after the initial complaint.  In addition, Warden Laird and Turner did not become aware of Murry's 2001 EEO complaint until March or April of 2002, approximately five (5) months before Warden Laird decided to transfer Murry, and almost six (6) months before Murry was ordered to undergo her physical fitness for duty examination.  Such long time frames, by themselves, cannot establish retaliation.  See e.g., Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (three-month interval between EEOC's right to sue letter and supervisor's announcement that she was contemplating employee's transfer was insufficient to establish causation); Drago v. Jenne, 453 F.3d. 1301, 1307-08 (11th Cir. 2006) (three-month interval between protected acts and adverse actions is too long to establish causal connection); Higdon, 393 F.3d at 1221 (three-month interval between protected speech and adverse act is too long, standing alone, to establish an inference of retaliation);

---

[19]Although the evidence supports that only Warden Laird was the decision maker for these actions, Turner did sign and deliver the letters transferring Murry and requesting she complete the fitness for duty examinations.

Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 951 (11th Cir. 2000) (seven-month time period between protected activity and adverse employment action is too indirect to satisfy causal connection requirement); Sullivan v. National R.R. Passenger Corp., 170 F.3d 1056, 1060-61 (11th Cir. 1999) (no causal link between protected activity in February 1994 and adverse employment action in late 1994 and early 1995); Vandesande v.  Miami-Dade County, 431 F.  Supp.2d 1245, 1257 (S.D. Fla.  2006) (six month gap between alleged adverse employment action and complaint to Department of Labor is too far removed to demonstrate a causal connection).  Thus, without more, Murry cannot prove the third prong of her *prima facie* case.

Turning to the record presented, the Court finds a complete lack of any other evidence demonstrating causation.  First, Murry has not provided any direct evidence that Warden Laird's decisions to transfer her and to require the fitness for duty examinations were because of, or related to, her 2001 EEO complaint.  See Schoenfeld v.  Babbitt, 168 F.3d 1257, 1266 (11th Cir.  1999) ("only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor" constitutes direct evidence).  Murry also has failed to provide any such evidence with respect to Turner.  Second, Murry cannot establish any circumstantial evidence of causation.  As discussed above, the temporal proximity between when she filed her 2001 EEO complaint, and even between when Warden Laird and Turner learned of the EEO complaint, is too attenuated from Murry's transfer and fitness for duty examinations to establish a causal connection.  Moreover, there is nothing in the record to show how Murry's 2001 EEO

complaint and these two events are related in any way, other than Murry's bare supposition and conclusions.   Accordingly, Murry has failed to meet her burden with respect to this element of her *prima facie* case.

III.    Legitimate, Non-Retaliatory Reasons

Even assuming that Murry could establish a causal connection between her transfer to the warehouse and the fitness for duty examinations and her 2001 EEO complaint, the Attorney General has met his burden of establishing legitimate non-retaliatory reasons for these acts.  See Meeks v. Computer Associates Int'l., 15 F.3d 1013, 1021 (11th Cir. 1994) (this burden is "exceedingly light," defendants need only proffer legitimate job or business reasons, not prove them).  The evidence demonstrates that Warden Laird, the person who made the decisions in question here, was concerned that Murry's emotional state was affecting her ability to perform her job duties, and even feared for her own personal safety. Murry's various outbursts were well-documented, as is the fact that Murry told several employees and supervisors that she suffered from a brain tumor.  Given the fact that Murry worked closely with 25-30 inmates on a daily basis, and served hundred of inmates every day, it is entirely reasonable that Warden Laird would want to ensure that Murry was fit to perform her duties, and not risk of the safety and welfare of all inmates and employees. It is also reasonable to place Murry in a less dangerous environment while her fitness was being assessed.  Moreover, the fact that Warden Laird returned Murry to the low facility as soon as he received the medical reports clearing her, weighs against any discriminatory or retaliatory motive.

Because the Attorney General has articulated legitimate non-retaliatory reasons for Murry's transfer to the warehouse and fitness for duty examinations, the burden now shifts back to Murry to identify a genuine issue of material fact with regard to whether the proffered reasons were pretextual.  <u>Bass v. Board of County Comm'rs</u>, 256 F.3d 1095, 1103-04 (11th Cir. 2001).  In order to show pretext, Murry must "demonstrate that the proffered reason was not the true reason for the employment decision . . . . [The Plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  <u>Texas Dept. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981).  <u>See also</u> <u>Howard v. BP Oil Co.</u>, 32 F.3d 520, 526 (11th Cir. 1994) ("[A] plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable.") (internal citations omitted).  In other words, the Court must assess "whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotations and citations omitted).

Murry has failed to meet this burden.  Other than her own bald assertions,[20] Murry has offered no evidence that the stated reasons for the adverse actions were pretextual. And, while she challenges her supervisors' perceptions of the events which led to her transfer and the examinations, Murry does not refute the basic facts surrounding each event.  Murry also has not provided evidence of other similarly situated employees who were treated differently.  The only "evidence" Murry points to is her prior performance record, which does not contain any disciplinary actions or negative evaluations,[21] and her own subjective belief that she was retaliated against.  This is not sufficient to establish pretext, or that Warden Laird's reasons are not believable.  See Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir.  1990) ("To survive summary judgment, the plaintiff must then present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext.  Mere conclusory allegations and assertions will not suffice.").

---

[20]Murry argues that she did not make any statements in August 2002 concerning the quality of the meat used in the inmates' lunch, or that she attempted to cause any inmate riots.  Whether or not she made such statements is irrelevant, there is more than enough documented evidence of other undisputed outbursts, her comments about her brain tumor, and her performance issues to support Warden Laird's decision to transfer her and order the fitness for duty examinations.

[21]Notably, Murry's 2001 and 2002 evaluations were not negative either, they were simply lower than her prior evaluations.  If anything, the fact that Murry was supervised more harshly by Turner, who herself is an African-American female, is simply indicative of Turner's management style in general.  Both parties presented evidence that Turner was quite strict with, and at times yelled at, many of her other employees.

IV.    Other Allegedly Retaliatory Actions

Murry has also put forth a litany of other comments and events which she claims were in retaliation for her 2001 EEO complaint.  For example, Murry alleges that AW Phillips told Warden Laird that she had a "delicate condition" and/or delicate psychological state.  Such comments, even if true, do not rise to the level of an adverse employment action, as she has not demonstrated that a reasonable employee would find such comments "materially adverse."  See Davis, 245 F.3d at 1238-39 ("Title VII [ ] is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace.") (internal quotations and citations omitted).

Next, Murry points to Turner's initial refusal to allow Murry to go home on August 21, 2002 when Murry claimed to have a migraine.  Again, this is not an adverse employment action as Murry did in fact go home only minutes after speaking with Turner, and was not punished for leaving early.

Murry then claims that in early 2003 she received a call from the Regional Office from an unknown person, who advised Murry that her 2001-2002 evaluation would be increased to "outstanding" if she agreed to drop her 2001 EEO complaint.  Aside from the fact that Murry has presented no evidence to support this allegation, it is not an adverse employment action, primarily because her evaluation was increased to "Outstanding" by Warden Laird, even though she did not drop her EEO complaint.

Murry also contends that deodorizer was sprayed in a room she was sitting in while working at the institutional warehouse, causing a severe allergic reaction, and that this

29

constitutes unlawful retaliation.  That is not so - even if spraying deodorizer could somehow be construed as an adverse employment action, the person who allegedly sprayed the deodorizer had nothing to do with Murry's 2001 EEO complaint, was not in a supervisory role to Murry, and there is no evidence that this person even knew of the 2001 EEO complaint.  There is simply a complete lack of causal connection.

Finally, Murry alleges that she was denied insurance benefits with respect to her shoulder injury - specifically she was refused payment for an MRI procedure - and that this denial of benefits, coupled with the request that she undergo a physical assessment and the termination of her employment in August 21, 2004, were in retaliation for her 2001 EEO complaint.  Murry has presented no evidence demonstrating a causal connection between these events and her EEO complaint three years earlier - she does not explain who made the decision to deny insurance benefits, who ordered her to undergo a physical examination, or who decided to terminate her employment, or even if such persons were aware of her 2001 EEO complaint.  In fact, two of the three persons Murry contends retaliated against her were no longer employed at Coleman at the time of Murry's termination.  Further, it is the Court's understanding, based on Murry's comments at the August 23, 2006 pretrial conference, that Murry voluntarily dismissed all allegations concerning these events from her EEO retaliation complaint in order to pursue relief before the Merit Service Protection Board.  The Board did not complete its proceedings until May 2006, and the Court is not aware of any attempts by Murry to amend her EEO retaliation complaint to reallege these events, or to file a new EEO complaint, therefore the Court

does not believe that Murry has exhausted her administrative remedies with respect to these allegations.[22]  Moreover, Murry admitted at the pretrial conference that her shoulder injury is permanent, and as a result, she is unable to perform <u>any</u> jobs at Coleman.  As such, her termination cannot be retaliatory in nature.[23]

## Conclusion

After a full and careful review of the record in this case, it is clear that the Plaintiff has not satisfied her burden of establishing a *prima facie* case of unlawful retaliation under Title VII.  It is equally clear that the Plaintiff has not established that the Attorney General's legitimate nondiscriminatory reasons for its actions are pretextual.  Accordingly, upon due consideration, it is ORDERED and ADJUDGED that the Defendant, the Attorney General of the United States of America's Motion for Summary Judgment (Doc. 30) is GRANTED. The Clerk is directed to enter judgment in favor of the Defendant and against the Plaintiff on all claims, terminate any pending motions, and close the file.

---

[22]In the Parties' Joint Pretrial Statement (Doc.  46), and during the pretrial conference, Murry made several comments concerning her desire to continue seeing her clinical psychologist. While not entire clear, it appears that Murry desires, at this late stage, to incorporate the discontinuance of her workers' compensation benefits into her Title VII claim for unlawful retaliation.  Because Murry has never raised these allegations during either the administrative proceedings or at any prior stage in this litigation, this issue is not properly before the Court.  Such claims should instead be brought before the appropriate agency charged with deciding workers' compensation matters.

[23]Murry also alleges that her seniority was taken away, that she has had an ongoing struggle obtaining proper medical care, and that the Food Service Administrator - apparently Turner - requested that she be suspended.  The Court will not consider any of these allegations as Murry has not presented a single shred of evidence to support them, other than bare self-serving statements in her Complaint and Opposition to Summary Judgment.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 28th day of August, 2006.

UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record
             Shawanda Murry, *pro se*